**H. Ray LAHR, Plaintiff,**

v.

**NATIONAL TRANSPORTATION SAFETY BOARD, Central Intelligence Agency and National Security Agency, Defendants.**

**No. CV 03–8023 AHM (RZx).**

United States District Court,
C.D. California.

Aug. 31, 2006.

See also 2006 WL 2854314.

John H. Clarke, John H. Clarke Law Offices, Washington, DC, John F. Dunne, Jr, John F. Dunne Jr. Law Offices, Los Angeles, CA, for Plaintiff.

David M. Glass, Elizabeth J. Shapiro, Department of Justice, Civil Division, Washington, DC, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CIA'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

MATZ, District Judge.

### INTRODUCTION

"Certain historical facts are unassailable, while others are constantly subject to attack and, ultimately, remain shrouded in mystery and confusion." *Minier v. Central Intelligence Agency*, 88 F.3d 796, 799 (9th Cir.1996). This irrefutable observation aptly describes the controversy that triggered this lawsuit. Barely more than ten years ago, on July 17, 1996, a United States commercial aircraft—TWA Flight 800—exploded in mid-air off the coast of Long Island. Everyone aboard perished. What happened? How? Why? Who was responsible? Was it an accident? A terrorist attack?

Of course there was an official investigation. And of course there was an official explanation. And of course there was an ensuing torrent of critics and skeptics who challenged the *bona fides* of the investigation and rejected the explanation.

Equally predictable, the doubters (or at least Plaintiff, representing one group of them) have now turned to the courts to seek a ruling ordering the Government to turn over information that it has thus far withheld. For the reasons set forth below, I find that plaintiff is entitled to some, but not all, of what he seeks. The Court therefore GRANTS summary judgment to Defendants only as to the records specified below.[1] In doing so, I do not purport to provide an answer to the above much-debated questions nor an affirmation or repudiation of the official government conclusion as to the cause of the flight's crash.

| MORI | NTSB | PLAINTIFF | SUMMARY JUDGMENT | DISCLOSURE REQUIRED? |
|------|------|-----------|------------------|----------------------|
| 551 | | | GRANT | NO |
| 552 | | 48 | DENY | YES |
| 553 | | | GRANT | NO |
| 554 | | 12 | DENY | YES |
| 555 | | | GRANT | NO |
| 556 | | 1 | GRANT | NO |
| 302 | | | DENY | YES |
| 380 | 33 | 66 | DENY | YES |
| 382 | 34 | 76 | DENY | YES |
| 382 | 35 | 77 | DENY | YES |
| ??? | 36 | 78 | DENY | YES |
| NSA Computer Program | | | GRANT | NO |

### I. *Background*

#### A. Factual Summary [2]

1. *The Crash Investigation and Ensuing FOIA Litigation*

The genesis of this suit lies in the tragic crash of Trans World Airline ("TWA") Flight 800 ("Flight 800"). On July 17, 1996, Flight 800 departed from John F. Kennedy International Airport in New

---

1. The MORI references are to the last three digits of Government's numbering system. The multiple identifications reflect the sad fact that the parties affixed multiple and confusing identifications to given documents.

2. The following factual summary incorporates facts presented in all three of the Defendants' various motions for partial summary judgment.

York City, en route to Charles de Gaulle International Airport in Paris, France. The aircraft crashed into the Atlantic Ocean twelve minutes after departure. There were no survivors of the accident and the aircraft, a Boeing 747–131, was destroyed. Some eyewitnesses recounted having seen "a streak of light, resembling a flare, moving upward in the sky to the point where a large fireball appeared . . . . [and] split into two fireballs as it descended toward the water." *Moye Decl.*, Ex. IV, at p. 278.

The National Transportation Safety Board ("NTSB") is an independent federal agency charged with investigating civil aviation accidents in the United States. 49 C.F.R. §§ 800.3, 831.2. The NTSB conducts investigations in order to determine the circumstances relating to and the probable causes of accidents and to make safety recommendations that are intended "to prevent similar accidents or incidents in the future." *Id.* § 831.4. The NTSB has the authority to designate parties to assist the agency in conducting an accident investigation. *Id.* § 831.11 ("Parties shall be limited to those persons, government agencies, companies, and associations whose employees, functions, activities, or products were involved in the accident or incident and who can provide suitable qualified technical personnel actively to assist in the investigation."). Following an accident investigation, the NTSB issues its probable cause determination and safety recommendations in an official report. *Id.* § 831.4.

Per its mandate, the NTSB conducted an investigation of Flight 800. The NTSB appointed several entities as party participants to assist in the investigation, including the Boeing Commercial Airplane Group ("Boeing CAG") and the Air Line Pilots Association ("ALPA").[3] Boeing also voluntarily provided information to the NTSB and Central Intelligence Agency ("CIA") concerning flight characteristics and performance of Boeing 747s. *Third Buroker Decl.*, at ¶ 10. The investigation of Flight 800 eventually produced a public docket containing approximately 2,750 documents. Public hearings were held in December 1997 and in August 2000. On August 23, 2000, the NTSB adopted the "Aircraft Accident Report: In-flight Breakup Over The Atlantic Ocean" (the "Accident Report") as the official NTSB accident report on Flight 800. *See Moye Decl.*, Ex. IV. The parties do not dispute that the Accident Report constitutes the NTSB's final conclusion as to the probable cause of the Flight 800 accident, although Plaintiff claims that the CIA animation, *see infra*, also constitutes a final conclusion.

The NTSB concluded that during the initial break-up of the aircraft, the forward fuselage detached from the remainder of the aircraft. The remainder briefly continued to climb in "crippled flight." *See Moye Decl.*, Ex. IV, at pp. 288, 290. Plaintiff Lahr calls this conclusion, of which he is skeptical, the "zoom-climb" conclusion.[4]

---

3. The other parties included the Federal Aviation Administration; TWA; the International Association of Mechanists, Aerospace Workers, and Flight Attendants; the National Air Traffic Controllers Association; Pratt & Whitney; Honeywell; and the Crane Company, Hydro–Aire, Inc. *Moye Decl.*, Ex. IV at p. 302.

4. Defendants construed the term "zoom-climb" conclusion "to refer to the flight path of the aircraft following the loss of the forward fuselage." *NTSB Mot'n*, at p. 4. This construction of the term corresponds with Lahr's characterization of the "zoom-climb" as "the aircraft's continuing to fly after the nose of TWA 800 was blown off, climbing as much as 3,200 feet." *Moye Decl.*, Ex. I–1, at p. 48.

Dennis Crider, a National Resource Specialist for Vehicle Simulation in the Vehicle Performance Division of the NTSB, was assigned to the investigation of Flight 800. Crider was tasked with determining the trajectories of parts of the aircraft and the flight path of the main wreckage following the loss of the forward fuselage. *Crider Decl.,* at ¶¶ 3–5. Crider developed four reports in the course of his involvement with the Flight 800 investigation: the Trajectory Study, the Main Wreckage Flight Path Study ("Flight Path Study") and the Errata to the Main Wreckage Flight Path Study, Addendum I to the Flight Path Study ("Addendum I"), and Addendum II to the Flight Path Study ("Addendum II"). These reports form a part of the extensive Flight 800 public docket and were considered by the NTSB panel (the "Safety Board") prior to its issuance of the Accident Report.

On October 8, 2003, Plaintiff H. Ray Lahr filed over one hundred Freedom of Information Act ("FOIA") requests with the NTSB and CIA, many of which have since been withdrawn. Lahr basically seeks the records upon which the four Crider reports, two video animations shown at the 1997 public hearing, and one CIA animation broadcast on the Cable News Network ("CNN")[5] are based. The requests are divided into eleven distinct categories (many of the requests fall into more than one category):

A. All records of formulas used by the NTSB in its computations of the zoom-climb conclusions;

B. All records of the weight and balance data used by the NTSB in its computations of the zoom-climb conclusions;

C. All records of the formulas and data entered into the computer sim-

ulations regarding the NTSB's zoom-climb conclusions;

D. All records reflecting whether or not the NTSB conducted the computer simulations in-house, and, if not, all records of when, where, and by whom the computer simulations were performed;

E. The computer simulation programs used by the NTSB and CIA;

F. The printout of the computer simulations used by the NTSB;

G. All records of the timing sequence of the zoom-climb, including, but not limited to radar, radio transmissions, and the flight data recorder ("FDR");

H. All records of the correlation of the zoom-climb calculations with the actual radar plot;

I. All records of the information provided by Boeing to the NTSB used by the NTSB to calculate these zoom-climb conclusions;

J. All records of the process by which the NTSB arrived at its zoom-climb conclusions;

K. All records generated or received by the NTSB used in its computations of its zoom-climb conclusions.

*Moye Decl.,* Ex. I–1, at p. 49.

The NTSB and CIA performed searches for these records and located a number of responsive records in the public docket and in responses to prior FOIA requests made by Lahr. They released certain records to Lahr, some of which were redacted. Lahr challenges the adequacy of the agencies' searches and the agencies' decisions to withhold, in full or in part, various records. The agencies assert that their searches were adequate, that they have turned over all responsive records to Lahr,

---

**5.** The CIA animation was broadcast on November 17, 1997. *NTSB Opp'n,* at p. 17.

and that they have properly withheld records, in full or in part, under provisions of FOIA that create exemptions from the statute's fundamental mandate of disclosure.

### 2. *Plaintiff's Allegations of Government Impropriety*

■ "[A]s a general rule, when documents are within FOIA's disclosure provisions, citizens should not be required to explain why they seek the information." *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 172, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). Here, however, the Government's basis for withholding many of the contested records is Exemption 7(C) under FOIA, which permits the government to withhold information compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." In such circumstances, "to balance the competing interests in privacy and disclosure [that courts must weigh in applying Exemption 7(C) ], ... the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable." *Id.* Instead, the requester must "establish a sufficient reason for the disclosure." *Id.* "[Where] the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.* at 174.

Here, Plaintiff seeks to prove that Defendants participated in a massive cover-up of the true cause of the crash of Flight 800, which he believes was a missile strike from an errant missile launched by the United States military. The following summary of the evidence Plaintiff presented to meet the threshold requirement described in *Favish* is based on Plaintiff's "Statement of Genuine Issues in Opposition to [the Second] CIA Motion for Partial Summary Judgment," especially the portion beginning at page 13. Defendants did not file any response to that statement, so on this motion, at least, Plaintiff's assertions have not been repudiated. Nor did Defendants file objections to that evidence.[6] The ensuing summary characterizes the evidence in the light most favorable to Plaintiff, *but does not reflect or constitute any finding by the Court.*

According to Plaintiff, then, the government withheld evidence from the Flight 800 probe.[7] The government altered evi-

---

**6.** Some of the evidence proffered by Plaintiff was clearly inadmissible and the Court does not consider it. *See, e.g., Hill Aff.,* Exh. C, p. 2 (Bates 46) (Donaldson statement meant to prove NTSB helped to hide witness lacks foundation concerning personal knowledge); *Stalcup Aff.,* Exh. E, at ¶ 6 (Bates 126) (claim that FBI admitted it recovered explosives material from the debris lacks foundation and contains inadmissible hearsay); *Neal Aff.,* at ¶ 3 (Bates 150) (statement concerning possible military operations is opinion without foundation, is irrelevant to the fact it allegedly supports, and contains inadmissible hearsay); *Scalcup Aff.,* at ¶ 17 (Bates 121) (whether disclosure would improve airline communi-

ty's understanding of crash is irrelevant to whether standard accident investigation procedure was followed).

**7.** *See Affidavit of Rear Admiral Hill,* at ¶ 17, Exh. C, pp. 2–3 (Bates 46–47) (adopting claims of William Donaldson, a deceased Naval Commander, that the NTSB assisted DOJ in hiding a witness and that the head of the FBI investigation placed the investigation in *"pending inactive status"* to avoid testing missile theory and to hide witness testimony); *Affidavit of James Speer,* at ¶¶ 14–15 (Bates 184) (ALPA's representative during the official probe claims that FBI covered up positive test for nitrates and hid airplane part); *Perry Aff.,*

dence during the investigation.[8] Evidence was removed from the reconstruction hangar.[9] The government misrepresented radar data, which does not correspond to the "zoom-climb" conclusion.[10] Radar data [11] and flight recorder data [12] are missing. It appears that underwater videotapes of the debris from the plane have been altered.[13] The government concealed the existence of a missile debris field and debris recovery locations.[14] At its first public hearing, the NTSB did not permit eyewitness testimony.[15] Many eyewitnesses vehemently disagree with the conclusions the CIA expressed in the video animation.[16] The CIA falsely reported that only twenty-one eyewitnesses saw anything prior to the beginning of the fuselage's descent into the water.[17] The FBI took over much of the investigation from the NTSB, which should have been in charge,[18] and the CIA never

at ¶ 50 (Bates 253) (FBI agent stated witness was too far away to see what she claimed); *Lahr Aff.*, at ¶¶ 52–54 (Bates 273) (FBI would not allow Witness Group to conduct witness interviews, contrary to normal NTSB procedure); *Young Aff.*, at ¶ 2(f) (Bates 394) (nongovernmental parties to investigation had no access to FBI witness summaries for over year).

8. *See Sanders Aff.*, at ¶¶ 9–10 (Bates 178–79) (investigative journalist quoting TWA pilot and participant in investigation, who claims center wing tank was altered after it was recovered).

9. *See Lahr Aff.*, Exh. 10, at ¶ 1 (Bates 370) (citing International Association of Machinists and Aerospace Workers' finding that investigation team's Cabin Documentation Group stated cabin wreckage began to disappear from hangar, and this appeared to be due to FBI; FBI never provided list of items taken, tests done or results, or whether wreckage was returned).

10. *See Fourth Schulze Aff.*, at ¶¶ 11–13 (electronic engineer claims that radar data shows immediate descent of aircraft after explosion).

11. *See Stalcup Aff.*, at ¶ 4 (Bates 126) (systems engineer with Ph.D. in Physics states last Riverhead data sweep shows four data points deleted from where a missile trajectory would have been located).

12. *See First Schulze Aff.*, at ¶ 5 (Bates 467) (NTSB investigators admitted "mishandling" last one-second line of data from tape; three to four seconds eventually determined to be missing).

13. *See Speer Aff.*, at ¶ 30 (Bates 186–87) (videotape shown had gaps in time clock, and agent refused to show unedited videotape).

14. *See Donaldson Aff.*, at ¶ 4, Exh. 1, p. 2 (Bates 69) (Commander William S. Donaldson, a recognized aircraft crash investigator now deceased, stated that missile established a separate debris field due to extreme energy level carrying it past plane, which was captured by radar video; NTSB made no effort at recovery in area, and FBI records and maps show it was specifically looking for missile body and first stage), ¶¶ 14–19 (Bates 54–55), Exh. 9 (Bates 88) (map of alleged debris field); *Speer Aff.*, at ¶ 21 (Bates 186) (keel beam recovery location changed by FBI).

15. *See Hill Aff.*, at ¶ 7, Exh. 1, p. 2 (Bates 46) (no witnesses allowed to speak at hearings); *Lahr Aff.*, at ¶ 24 & Exh. 2 (Bates 269, 306–09) (FBI objected to use of CIA video and witness materials or testimony at public hearing).

16. *See Brumley Aff.*, at ¶¶ 1–2 (Bates 210) (representation in video isn't close to what he saw); *Wire Aff.*, at ¶¶ 2–5 (Bates 214) (what was in video did not represent what he had told agent); *Fuschetti Aff.*, at ¶¶ 1–2 (Bates 191) (pilot of other plane never saw vertical movement); *Meyer Aff.*, at ¶ 5(b) (Bates 193) (aircraft never climbed); *Angelides Aff.*, at ¶ 5 (Bates 215) (animation bore no resemblance to what he saw); *Lahr Aff.*, at ¶ 66 (Bates 277) (not aware of any witness produced by FBI, CIA or NTSB that corroborated "zoom-climb" theory).

17. *See Donaldson Aff.*, Exh. 16 (Bates 101) (Witness Group factual report states that, of 183 witnesses who observed a streak of light, 96 said it originated from the surface).

18. *See Speer Aff.*, at ¶ 12 (FBI took over investigation even though not qualified); *Meyer Aff.*, at ¶ 5(d) (Bates 192) (FBI would not

shared its data and calculations of the trajectory study with others for peer review, which would have been appropriate.[19]

Plaintiff also submits evidence that the government's conclusion that there was a center-wing fuel tank explosion and the government's "zoom-climb" theory were physically impossible under the circumstances. For example, evidence suggested there was no spark in the center-wing fuel tank.[20] Once an explosion occurred, engine thrust would have been cut off with the loss of the nose of the plane.[21] Furthermore, the aviation fuel used in Flight 800 is incapable of an internal fire or explosion.[22] The zoom-climb theory is impossible because at least one wing separated early in the flash sequence.[23] Additionally, a steeper climb would likely result in a reduction in ground speed, which contradicts radar evidence.[24] In fact, Plaintiff's evidence suggests the "zoom-climb" theory is aerodynamically impossible.[25]

Finally, Plaintiff also claims that there were "military assets" conducting classified maneuvers in the area at the time of the crash, and several vessels in the area remain unaccounted for.[26]

---

allow NTSB Witness Group chairman to interview Meyer); *Gross Aff.*, at ¶¶ 4–5 (Bates 211) (NTSB is charged with this sort of investigation); *Lahr Aff.*, Exh. 5 (Bates 325–29) (Air Line Pilots Association stated that typical investigative practices such as witness interviews and photographic documentation, were prohibited or curtailed and controlled due to criminal investigative mandate), Exh. 10 (Bates 365) (trade union party to investigation was at first excluded by FBI).

**19.** *See Hill Aff.*, at ¶ 3 (Bates 50) (usual to share information and assessments for peer review); *Lahr Aff.*, at ¶¶ 47–48, 50 (Bates 272) (flight path group should have been formed and conclusions part of public record, but party process was violated; conclusions that cannot be independently verified are not valid for accident investigation purposes); *Young Aff.*, at ¶ 2(f) (Bates 394) (non-governmental parties did not participate in simulation work).

**20.** *See Donaldson Aff.*, Exh. 1, p. 3 (Bates 70) (no signs of metal failure on wing's scavenge pump); *Lahr Aff.*, at Exh. 10, § 4, ¶¶ 1–3 (Bates 366) (union report compiled by International Association of Machinists and Aerospace Workers found there was no spark in the center fuel tank).

**21.** *See Affidavit of Lawrence Pence* (retired Air Force Colonel and Defense Intelligence Agency aide), at ¶ 6 (Bates 259).

**22.** *See Harrison Aff.*, p. 2, at ¶¶ 1–9 (Bates 153) (combustible liquid, as used in airplanes, is not capable of internal fire or explosion because of lack of flammable vapors in tank).

**23.** *See Rivero Aff.*, at ¶ 13 (Bates 264) (center-wing tank explosion collapses wings); *Stalcup Aff.*, at ¶ 9 (Bates 120) (debris field indicates left wing damaged early in crash sequence); *Young Aff.*, at ¶¶ 2(a)-(b) (Bates 393) (loss of nose, and then wings, caused significant reduction in forward momentum and kinetic energy).

**24.** *See Donaldson Aff.*, at ¶¶ 68, 72 (Bates 62–63) (applies principles to evidence); *Stalcup Aff.*, at ¶ 3 (Bates 126) (examines physical principles).

**25.** *See Hill Aff.*, at ¶ 4 (Bates 51) (airplane at more than twenty degrees inclination will stall because it will no longer produce lift); *Pence Aff.*, at ¶ 8 (Bates 259) (same); *Lahr Aff.*, at ¶ 62 (Bates 275) (plane would have stalled about one and a half seconds after nose separation); *see generally Third Lahr Aff.* (under physical characteristics concluded by government, aircraft could never have reached impact point).

**26.** *See Donaldson Aff.*, at ¶ 11 & Exh. 7 (Bates 53, 85–86) (there were 25 vessels in area of crash that NTSB and Navy were unwilling to identify), at ¶ 11, Exh. 6 (Bates 82–83) (Schiliro letter, on behalf of FBI, acknowledging existence of unidentified vessel), at ¶ 11 & Exh. 7 (Bates 269, 306–09) (three naval vessels on classified maneuvers and helicopter were part of radar hits); *Perry Aff.*, at ¶¶ 9–12 (Bates 246) (military ship had passed close to shore earlier that day); *Hill Aff.*, at ¶ 14

For the purpose of determining whether Exemption 7(C) (and other FOIA provisions) are applicable, and only for that purpose, the Court finds that, taken together, this evidence is sufficient to permit Plaintiff to proceed based on his claim that the government acted improperly in its investigation of Flight 800, or at least performed in a grossly negligent fashion. Accordingly, the public interest in ferreting out the truth would be compelling indeed.

## B. Procedural Summary

On November 6, 2003, Plaintiff H. Ray Lahr filed suit against the NTSB. Thereafter he added as defendants the CIA and National Security Agency ("NSA") (together, "Defendants"). Lahr is a former Navy pilot and retired United Airlines Captain who has served as ALPA's Southern California safety representative for over fifteen years. Defendants are government agencies subject to FOIA, 5 U.S.C.A. § 552. On December 17, 2003, Lahr filed a First Amended Complaint, and on February 6, 2006, Lahr filed a Second Amended Complaint ("SAC"). The SAC seeks proper identification by the Defendants of records responsive to requests that Lahr has made under FOIA, preliminary and final injunctions prohibiting Defendants from withholding the records at issue, and a mandatory injunction requiring Defendants to make certain of their computer and software programs available to Plaintiff for inspection. *SAC*, at pp. 6–7.

On August 16, 2005, the CIA moved for partial summary judgment on some redacted or withheld records found in CIA files ("First CIA Motion"). On October 18, 2005, the Court took that motion under submission without oral argument, anticipating that the motion now pending before the Court—namely, the CIA's May 1, 2006 motion for partial summary judgment on the remaining redacted or withheld records found in CIA files ("Second CIA Motion")—would be filed. According to the CIA, its second motion covers all CIA records not encompassed by its first motion, but without any overlap; in other words, every disputed withholding of a CIA record is challenged in one or the other of these motions. The Second CIA Motion involves twelve such records, although Plaintiff does not oppose the exemptions claimed in three of them.

On June 8, 2004, before the CIA filed its two partial summary judgment motions, the NTSB moved for partial summary judgment on all redacted and withheld records originally found in its agency files. On September 27, 2004, the Court heard oral argument, took that motion under submission and ordered those records be provided in unredacted form for *in camera* review.

Thus, the Court has three summary judgment motions to decide. Its resolution of these motions has been seriously impeded by the multiple and confusing document identification systems that the parties utilized. As the Court has been forced to note previously, the parties identified disputed documents with different, non-overlapping numbering systems, and they could not agree which documents fell within more than one reference, even after being instructed to do so by the Court.

On July 10, 2006, the Court held a hearing concerning the Second CIA Motion. As a result of glaring deficiencies in the

(Bates 43) (one surface ship left area at 32 knots). *See also Donaldson Aff.*, Exh. 16 pp. 4–5 (Bates 99–100) (U.S. Navy P–3 was allegedly passing by, turned around, and briefly assisted in recovery efforts; P–3 had broken transponder); *Holtsclaw Aff.*, at ¶¶ 2–4 (Bates 173) (radar tape shows U.S. Navy P–3 passed over plane seconds after missile hit).

government's *Vaughn* index, the Court thereafter ordered Defendants to submit for *in camera* review unredacted copies of several documents at issue in this motion. The Court has now reviewed those materials.

## II. *Discussion*

### A. Legal Standards

#### 1. *Motion for Summary Judgment*

FOIA actions usually are resolved via summary judgment motion practice. *See Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 369 (11th Cir.1993). Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden*

*Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party; the moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.' " *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.' " *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper. *Braxton–Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985).

## 2. *The Freedom of Information Act (FOIA)*

■ Under FOIA, federal agencies are required to make a broad range of information available to the public, including information regarding the agency's organization, general methodology, rules of procedure, substantive rules, general policy, final opinions, statements of policy and interpretations it adopted. 5 U.S.C.A. § 552(a). The purpose of FOIA is to protect "the citizens' right to be informed about 'what their government is up to.'" *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) [hereinafter *Reporters Comm.*]. In deference to the "philosophy of full agency disclosure" that animates FOIA, "[t]he Supreme Court has interpreted the disclosure provisions of FOIA broadly...." *Lion Raisins Inc. v. United States Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (quotation omitted); *see also Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) ("disclosure, not secrecy, is the dominant objective of" FOIA).

■ This Court has jurisdiction "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C.A. § 552(a)(4)(B); *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). The district court reviews *de novo* an agency's denial of requests made pursuant to FOIA. 5 U.S.C.A. § 552(a)(4)(B); *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1384 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

A requester may challenge an agency's response to a FOIA request in two ways: *first*, the requester may claim that the agency failed to make a sufficient or reasonable search of its records in response to a FOIA request, *see, e.g., Zemansky v. United States Envtl. Prot. Agency*, 767 F.2d 569, 571 (9th Cir.1985) (requester claiming that agency search was "deficient"), and *second*, the requester may claim that the agency has claimed an exemption that does not apply to the records the agency found but withheld. *See, e.g., Favish*, 541 U.S. at 160–64, 124 S.Ct. 1570.

### a. Adequacy of the Agency's Search

■ The agency carries the burden of demonstrating that "it has conducted a search reasonably calculated to uncover all relevant documents." *Zemansky*, 767 F.2d at 571 (quotation omitted) (finding agency search adequate based on "relatively detailed" affidavits). The standard is not whether there is a possibility that undisclosed documents, responsive to a particular FOIA request, exist somewhere in the agency's records, "but rather whether the *search* for those documents was *adequate*. The adequacy of the search, in turn, is judged by a standard of reasonableness and depends ... upon the facts of each case." *Id.* (quotation omitted; emphasis in original). The agency may use affidavits to establish that it has conducted

a sufficient search of its records, but "[a]ffidavits describing agency search procedures are sufficient for purposes of summary judgment only if they are relatively detailed in their description of the files searched and the search procedures, and if they are nonconclusory and not impugned by evidence of bad faith." *Id.* at 573 (quotation omitted; alteration in original); *see also Meeropol v. Meese,* 790 F.2d 942, 952 (D.C.Cir.1986) (noting that agency affidavits are entitled to a "presumption of good faith"). If the court determines that "the agency has sustained its burden of demonstrating that it conducted a reasonable search ... the burden [then] *shifts to the plaintiff [/requester]* to make a showing of agency bad faith sufficient to impugn the agency's affidavits." *Katzman v. Cent. Intelligence Agency,* 903 F.Supp. 434, 437 (E.D.N.Y.1995) (emphasis added) (noting that in a FOIA-related motion for summary judgment the "facts are viewed in a light most favorable to the requester of information"). On this motion—the Second CIA Motion—Plaintiff does not contend that the Defendants' searches were inadequate.

b. Claims of Exemption (Generally)

▇▇▇▇▇ An agency's withholding of documents must fall into one of nine exemptions. 5 U.S.C.A. §§ 552(b)(1)-(9), 552(d). In accordance with the broad disclosure provisions of FOIA, the enumerated exemptions are narrowly construed. *See, e.g., John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989), *reh'g denied,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 966 (1990). An agency must provide a requester with "[a]ny reasonably segregable portion of a record ... after deletion of the portions which are exempt under [section 552(b)]...." 5 U.S.C.A. § 552(b).

▇▇▇▇▇ The agency seeking to withhold documents carries the burden of proving that a claimed exemption is applicable to the record or portion of the record that has been withheld. 5 U.S.C.A. § 552(a)(4)(B); *Lion Raisins,* 354 F.3d at 1079. In order to establish that it has properly withheld records, the agency may submit, or may be required to submit, a *Vaughn* index. *Wiener v. Fed. Bureau of Investigation,* 943 F.2d 972, 977, *reh'g denied,* 951 F.2d 1073 (9th Cir.1991), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992); *see Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) ("[C]ourts will simply no longer accept conclusory and generalized allegations of exemptions ... but will require a relatively detailed analysis in manageable segments."). A *Vaughn* index should "identify[ ] each document withheld, the statutory exemption claimed, and a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." *Wiener,* 943 F.2d at 977. If the *Vaughn* index is not sufficiently detailed, the court may order an *in camera* review of the withheld documents. 5 U.S.C.A. § 552(a)(4)(B); *Lion Raisins,* 354 F.3d at 1079 (citation omitted).

The CIA has withheld documents at issue in this motion under Exemptions 2, 3, 4, 5, 6 and 7(C). The Court first will review the principles underlying each of these exemptions and afterward will apply those principles to the particular records at issue.

i. *Exemption 2: Internal Personnel Rules and Practices*

▇▇▇ This exemption provides that the disclosure requirements of FOIA do not apply to matters "related solely to the internal personnel rules and practices of

an agency." 5 U.S.C.A. § 552(b)(2). Although, in an attenuated sense, virtually everything undertaken by a federal agency could be said to be related to the "internal personnel ... practices of ... [that] agency," not everything is "solely" related, and the "potentially all-encompassing sweep of a broad exemption ... undercuts the vitality of any such approach." *Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir.1997) (quoting *Vaughn*, 523 F.2d at 1150 (Leventhal, J., concurring)). For this reason, this exemption is construed narrowly. *See Rose*, 425 U.S. at 367–68, 96 S.Ct. 1592.

 The Ninth Circuit has recognized that "law enforcement materials, the disclosure of which may risk circumvention of agency regulation, are exempt under Exemption 2." *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 656 (9th Cir.1980) (citation omitted). The term "law enforcement materials" is not limited to enforcement of criminal laws. *See, e.g., Dirksen v. Dep't of Health & Human Servs.*, 803 F.2d 1456, 1459 (9th Cir.1986) (concerning processing guidelines for Medicare program); *Ginsburg, Feldman & Bress v. Fed. Energy Admin.*, 591 F.2d 717, 723–31, *aff'd en banc*, 591 F.2d 752 (D.C.Cir.1978) (equally divided court), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979) (concerning audit guidelines).

In contrast to "administrative materials," which "involve the definition of the violation and procedures required to prosecute the offense," law enforcement materials involve "methods" of enforcing the laws, however interpreted. *Id.* at 657.

 When an agency believes materials sought by a FOIA request are exempt as law enforcement materials, it must submit a detailed affidavit describing how disclosure would risk circumvention of agency regulation. *Hardy*, 631 F.2d at 657. If this explanation is reasonable, the court should find the materials exempt from disclosure unless an *in camera* examination reveals that they contain "secret law"—*i.e.*, a non-public interpretation or policy that governs the agency's actual practices—or that the agency has not fairly described their contents. *Id.*

*ii. Exemption 3: Materials Specifically Exempted from Disclosure by Other Statutes*

 This exemption provides that the disclosure requirements of FOIA do not apply to matters "specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C.A. § 552(b)(3). The exemption applies only if the proffered statute falls within the scope of Exemption 3 and if the requested information falls within the scope of the statute. *Minier*, 88 F.3d at 801.

 Here, Defendants have relied on two statutes to justify withholding materials under Exemption 3. The first is the National Security Agency Act of 1959, Pub.L. No. 86–36, § 6(a), 73 Stat. 63 (1959), *codified at* 50 U.S.C.A. § 402.[27] Section 6(a) states:

Except as provided in subsection (b) of this section,[28] nothing in this Act or any

---

**27.** Section 6(a) of the National Security Agency Act of 1959 appears only as a note to 50 United States Code Annotated section 402.

**28.** Subsection (b) states that the "reporting requirements of section 1582 of title 10, United States Code, shall apply to positions established in the National Security Agency in the

other law . . . shall be construed to require the disclosure of the organization or *any function of the National Security Agency, of any information with respect to the activities thereof,* or of the names, titles, salaries, or number of the persons employed by such agency.

(emphasis added). The protection afforded by section 6(a) is "by its very terms absolute." *Linder v. Nat'l Sec. Agency,* 94 F.3d 693, 698 (D.C.Cir.1996).[29] Material within the purview of section 6(a) may be withheld under Exemption 3. *Hayden,* 608 F.2d at 1389.

■■■ The second statute Defendants invoke to support their Exemption 3 withholding is 50 United States Code Annotated section 403g, which states:

In the interests of the security of foreign intelligence activities of the United States and in order further to implement section 102A(I) of the National Security Act of 1947 that the Director of National Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the [Central Intelligence] Agency shall be exempted from the provisions of . . . any . . . law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency.

Section 102A(I) of the National Security Act of 1947, 50 United States Code Annotated section 403–1(i)(1), requires the Director of National Intelligence to protect intelligence sources and methods from unauthorized disclosure.[30] Sections 401–1(i)(2) and (3) provide guidance on how to do so. Material within the purview of sections 401–1 and 403g may be withheld under Exemption 3. *Minier,* 88 F.3d at 801 (citing section 403g and predecessor to 401–1).

### iii. Exemption 4: Trade Secrets and Confidential Commercial or Financial Information

This exemption applies to information that qualifies as "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C.A. § 552(b)(4). The terms "commercial" and "financial" retain their ordinary meaning and the term "person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C.A. § 551(2) (person); *Pub. Citizen Health Research Group v. Food & Drug Admin.,* 704 F.2d 1280, 1290 (D.C.Cir. 1983) (commercial and financial). The meaning of the term "confidential" is not so easily determined, however.[31] FOIA contains no definition and the once widely-applied test for "confidentiality" has re-

---

manner provided by section 4 of this Act." National Security Agency Act of 1959, Pub.L. No. 86–36, § 6(b), 73 Stat. 63 (2006). Section 4 of the Act was repealed in 1996. *See* National Defense Authorization Act for Fiscal Year 1997, Pub.L. No. 104–201, tit. XVI, § 1633(b)(1), 110 Stat. 2751 (1996). Therefore, this codified "exception to the exception" was effectively eliminated even before Plaintiff submitted his first FOIA request.

29. The Court cannot locate any decision granting disclosure of NSA records requested under FOIA and purportedly withheld under section 6(a).

30. Section 102A(i) was enacted as part of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub.L. No. 108–458, § 1011, 118 Stat. 3638 (2004).

31. "[W]hether the information is of a type which would normally be made available to the public, or whether the government has promised to keep the information confidential is not dispositive under Exemption 4." *See GC Micro Corp. v. Def. Logistics Agency,* 33 F.3d 1109, 1113 (9th Cir.1994).

cently been modified by the Court of Appeals for the District of Columbia, the court which initially created that test.

The original test was established by *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C.Cir.1974). In *National Parks*, the appellant sought access to records of the Department of the Interior consisting of audits, annual financial statements and other financial information of companies operating concessions in national parks. *Nat'l Parks*, 498 F.2d at 770. The district court determined that the "information [sought] was of the kind 'that would not generally be made available for public perusal'" and declined to order disclosure. *Nat'l Parks & Conservation Ass'n v. Morton*, 351 F.Supp. 404, 407 (D.D.C.1972) (citation omitted). The Court of Appeals reversed. *Nat'l Parks*, 498 F.2d at 771.

In interpreting the scope of the requirement that agency-withheld commercial or financial material be "confidential," the *National Parks* court was guided by the congressional understanding that the Exemption "is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but *which would customarily not be released to the public* by the person from whom it was obtained." *Nat'l Parks*, 498 F.2d at 766 (citing S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)) (emphasis added). In light of this explanation, the Court of Appeals announced that,

> [for the purposes of Exemption 4,] commercial or financial matter is "confidential" ... if disclosure of the information is likely to have either of the following effects: *(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.*

*Id.* at 770 (emphasis added).

In light of the *National Parks* test, the Court of Appeals found that the district court had failed "inquire into the possibility that disclosure [would] harm legitimate private or governmental interests in secrecy" and remanded the matter to the district court "for the purpose of determining whether public disclosure of the information in question pose[d] the likelihood of substantial harm to the competitive positions of the parties from whom it ha[d] been obtained." *Nat'l Parks*, 498 F.2d at 770–71 (also noting that "[s]ince the concessioners [were] *required* to provide [the requested] financial information to the government, there is presumably no danger that public disclosure will impair the ability of the Government to obtain this information in the future" (emphasis added)).

Nearly two decades later, the Court of Appeals for the District of Columbia revisited the *National Parks* test. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C.Cir.1992) (en banc), *cert. denied*, 507 U.S. 984, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993) (hereinafter *Critical Mass*). In *Critical Mass*, the Critical Mass Energy Project ("CMEP"), a public interest organization, sought access to safety reports prepared by the Institute of Nuclear Power Operations ("INPO"), which INPO voluntarily submitted to the Nuclear Regulatory Commission ("NRC") on the condition that the NRC maintain the confidentiality of those records. *Critical Mass*, 975 F.2d at 874. Citing Exemption 4, the NRC claimed that the INPO reports contained confidential commercial information. *Id.* The panel decision granted summary judgment in favor of the NRC on the grounds that the reports were both commercial and confiden-

tial and therefore properly withheld pursuant to Exemption 4. *Id.* The Court of Appeals ordered that the case be heard *en banc*, in part "to reconsider the definition of 'confidential' set forth in *National Parks* ... for the purposes of applying ... [Exemption 4]." *Id.* at 875 (quotation omitted).

The *en banc* panel refined the *National Parks* test insofar as that test applied to information that had been voluntarily submitted to an agency, as was the information Boeing provided to the NTSB. *Id.* at 877–79. The court explained that "when information is obtained under duress [as it had been in *National Parks*], the Government's interest is in ensuring its continued *reliability;* [but] when that information is volunteered, the Government's interest is in ensuring its continued *availability.*" *Id.* at 878 (emphasis added). The court noted that the distinction between voluntary and compelled information was equally salient when considering the second ("competitive injury") prong of the *National Parks* test. It reasoned that, where the production of information is compelled,

> there is a presumption that the Government's interest is not threatened by disclosure ... and as the harm to the private interest (commercial disadvantage) is the only factor weighing against FOIA's presumption of disclosure, that interest must be significant. Where, however, the information is provided to the Government voluntarily, the presumption is that the [Government's] interest will be threatened by disclosure as the persons whose confidences have been betrayed will, in all likelihood, refuse further cooperation. *In those cases, the private interest served by Ex-*

*emption 4 is the protection of information that, for whatever reason, "would customarily not be released to the public by the person from whom it was obtained ...."*

*Id.* at 878–79 (quotation omitted and emphasis added).

The en banc panel went on to conclude, Accordingly, while we reaffirm the *National Parks* test for determining the confidentiality of information submitted under compulsion, we conclude that financial or commercial information provided to the Government on a voluntary basis is "confidential" for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained.

*Id.* at 879.

In a strong dissent, then-Judge Ruth Bader Ginsberg argued that the court was misguided in altering the standard of "confidentiality" for "all cases in which commercial or financial information is given to the Government voluntarily." *Id.* at 882 (Ginsberg, J., dissenting). The dissent saw this alteration as "slackening" the objectivity of the *National Parks* test [32] and explained that, "[t]o the extent that the [majority] allows [voluntary] providers to render categories of information confidential merely by withholding them from the public long enough to show a custom, the revised test is fairly typed 'subjective' and substantially departs from *National Parks*." *Id.* at 883. Further, the dissent argued, the "slackened" test for voluntary submissions was "difficult to reconcile" with the statutory mandate of FOIA to construe exemptions narrowly, because under the refined standard parties opposing

---

**32.** Exemption 4 is "objective" in the sense that "a bare claim of confidentiality ... [does not] immunize agency files from scrutiny." *Bristol–Myers Co. v. Fed. Trade Comm'n*, 424 F.2d 935, 938 (D.C.Cir.1970). Rather, it is the district court that must "determin[e] the validity and extent of the claim...." *Id.*

disclosure are not required "to show in each case 'how disclosure will significantly harm some relevant or private governmental interest.'" *Id.* at 884–85 (citation omitted).

The Ninth Circuit and the majority of the other circuits adopted the initial *National Parks* test for "confidentiality," *see, e.g., Pac. Architects & Eng'rs, Inc. v. Dep't of State,* 906 F.2d 1345, 1347 (9th Cir. 1990), but the Ninth Circuit has not addressed the *Critical Mass* modification of that test for voluntarily-submitted information. *See, e.g., Frazee v. United States Forest Serv.,* 97 F.3d 367, 372 (9th Cir. 1996) (noting that because the information at issue was not voluntarily submitted to the agency, the court need not address the distinction "between voluntary and mandatory information" established in *Critical Mass* ). However, in *Dow Jones Co., Inc. v. Federal Energy Regulatory Commission,* 219 F.R.D. 167 (C.D.Cal.2003) (Snyder, J.), the district court considered the *Critical Mass* test and rejected it in favor of adherence to the more stringent *National Parks* test. *Id.* at 177.

In *Dow Jones,* the plaintiffs sought disclosure "of [an appendix] relating to an investigation [and interviews] conducted by [the] Federal Energy Regulatory Commission (FERC) of energy production and sales at two California power plants." *Id.* at 169. The defendant claimed that disclosure of the appendix would jeopardize the government's ability to obtain like information in the future. *Id.* at 178. The district court, in large part relying on the *Critical Mass* dissent, noted that "the holding [in *Critical Mass* ] is not consistent with Ninth Circuit jurisprudence, nor with the purposes of Congress in enacting FOIA, which mandates the courts to favor disclosure to serve the public interest." *Id.* The Court observed that an agreement for or a claim of confidentiality was insuffi-

cient to avoid disclosure and that if such a standard were adopted "any agency could, theoretically, simply hand out promises of confidentiality to individuals who gave information in order to avoid judicial review...." *Id.* at 178. For these reasons, the Court held that Exemption 4 did not apply because the defendant had failed to establish that disclosure would result in a harm to the government or to a private interest. *Id.* at 179.

■ This Court, too, finds that the *National Parks* test is the appropriate test to be applied in circumstances, such as those here, where information has been voluntarily given to an agency. However, the "government need not show that releasing the documents would cause 'actual competitive harm.' Rather, the government need only show that there is (1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released." *Lion Raisins,* 354 F.3d at 1079 (citing *G.C. Micro Corp.,* 33 F.3d at 1113) (finding likelihood of substantial competitive harm because the withheld documents contained commercial information provided by the requester's competitors and disclosure would allow the requester to underbid its competitors).

In the context of Exemption 4, competitive harm analysis "is ... limited to harm flowing from the affirmative use of proprietary information *by competitors.* Competitive harm should not be taken to mean simply any injury to competitive position...." *Pub. Citizen Health Research Group,* 704 F.2d at 1291–92 & n. 30 (quotation omitted; emphasis in original) (affirming the district court's conclusion that the FDA could withhold certain clinical test information that manufacturers of intraocular lenses had been required to submit to the agency, based on a finding that disclosure of the commercial information

would cause "substantial competitive injury"). Although "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] ... [c]onclusory and generalized allegations of substantial competitive harm ... are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* at 1291 (internal citation omitted).

Plaintiff argues that for any record falling under Exemption 4, the Court must apply a balancing test between the public interest in disclosure and the private interests protected by the exemption. However, Plaintiff cites no applicable precedent for this proposition. The only test the Court may apply is that found in *National Parks. See Pub. Citizen Health Research Group v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C.Cir.1999) (*National Parks* test *is* the balancing test).[33]

### iv. Exemption 5: Privileged Inter-and Intra–Agency Communication

This exemption provides that the FOIA disclosure requirements do not apply to information that qualifies as "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C.A. § 552(b)(5). The privilege that Defendants rely on here is commonly referred to as the "deliberative process privilege," which is commonly understood to "cover[ ] 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated....' " *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (quoting *Nat'l Labor*

*Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)) (internal quotation marks omitted in original).

In order "[t]o fall within the deliberative process privilege, a document must be ... [1] 'predecisional' and [2] 'deliberative.' " *Carter v. United States Dep't of Commerce*, 307 F.3d 1084, 1089–91 (9th Cir.2002) (citation omitted) (holding that statistically adjusted census data which had not been released as official 2000 Census numbers was neither predecisional nor deliberative). "A document may be considered predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Assembly of the State of California v. United States Dep't of Commerce*, 968 F.2d 916, 921 (9th Cir. 1992) (en banc) (hereinafter *Assembly* ) (citation omitted), *as amended on denial of reh'g* (Sept. 17, 1992). A predecisional document "may include 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency[.]' " *Id.* at 920 (citation omitted). A predecisional document is "deliberative" if the "disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* at 921 (quotation omitted; alteration in original). Although early cases "contrasted 'factual' and 'deliberative' materials," that distinction has lost strength. *Id.* at 921. Now, "[t]he key inquiry is whether revealing the information exposes the deliberative process. The factual/deliberative distinction survives, but simply as a useful rule-of-thumb favor-

---

**33.** Similarly, this Plaintiff-proposed balancing test is inapplicable to Exemption 5, discussed in the next section. There, the only test the

Court may apply is whether the record is both predecisional and deliberative.

ing disclosure of factual documents, or the factual portions of deliberative documents where such a separation is feasible." *Id.* (internal citation omitted). If the release of factual data would "enable the public to reconstruct any of the protected deliberative process" it may properly be withheld by the agency. *Id.* at 922–23.

> *v. Exemption 6: Protection of Personal Information Contained in Personnel, Medical, or Similar Files* [34]

■■■ Under this exemption, an agency may properly withhold documents that are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C.A. § 552(b)(6). "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982).

For purposes of Exemption 6, a "file" is a compilation of agency records. James T. O'Reilly, 2 *Federal Information Disclosure* § 16:3 (3d ed.2005). "Records" includes "all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business." 44 U.S.C.A. § 3301; *see Forsham v. Harris*, 445 U.S. 169, 183, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) (adopting section 3301 definition of "records" because FOIA does not define term).

Examples of records whose release might invade individuals' privacy include arrest records, discipline records, passport or Social Security numbers, job performance records, union membership cards, and the like. *See* James T. O'Reilly, 2 *Federal Information Disclosure* § 16:16 (3d ed.2006). Moreover, it is conceivable that in certain situations, the release of an individual's name, in and of itself, would violate his or her privacy interest, although such disclosure is not inherently a significant threat to an individual's privacy. *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 877 (D.C.Cir.1989).

■■■ To determine whether a document, or portion thereof, was properly withheld under Exemption 6, a court must balance the privacy interest protected by Exemption 6 against the "the public interest in disclosure." *United States Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994) (quotation omitted). The agency seeking to withhold information has the

---

**34.** In their Reply on the current motion, Defendants state:

> When plaintiff responded to the First CIA Motion, he did not oppose the use of Exemption 6 or, in the alternative[,] Exemption 7(C) to withhold, from the records covered by the First CIA Motion, the names of FBI agents or of eyewitnesses to the explosion of TWA Flight 800 ... Changing his position, he now alleges that he *does* contest the use of the above exemptions to withhold, from those records, the names of FBI agents and eyewitnesses.

*Def. Reply,* at p. 16 n. 2. Defendants claim Plaintiff's earlier statement should be treated as a binding waiver. *Id.* (citing *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938))). Without determining at this point whether the earlier statement operates as a binding waiver concerning documents which are at issue in the previously-filed motions, the Court finds it does not preclude Plaintiff from contesting these exemptions with regard to documents at issue in the present motion.

**1178**

burden of establishing "the significance of the privacy interest at stake." *United States Dep't of State v. Ray*, 502 U.S. 164, 176, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (finding that release of the names and addresses of Haitian interviewees in conjunction with highly personal information regarding marital and employment status would constitute a "significant" invasion of privacy). The public interest in disclosure "focuses on the citizens' right to be informed about 'what their government is up to.' Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." *Id.* at 177–78, 112 S.Ct. 541 (citation omitted; emphasis in original).

 *vi. Exemption 7(C): Records or Information Compiled for Law Enforcement Purposes*

 Under Exemption 7(C), an agency may properly withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C.A. § 552(b)(7)(C). Exemption 7(C) may not be used when an agency does not have the law enforcement power to conduct an investigation. *See Weissman v. Cent. Intelligence Agency*, 565 F.2d 692, 696 (D.C.Cir.1977).

 Because of their similar language, Exemption 7(C) is often closely associated with Exemption 6. However, Exemptions 7(C) and 6 "differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions," the former being more protective of privacy than the latter. *Dep't of Defense*, 510 U.S. at 496 n. 6, 114 S.Ct. 1006. Exemption 7(C) applies to any disclosure that " 'could reasonably be ex-

pected to constitute' an invasion of privacy that is 'unwarranted,' while Exemption 6 bars any disclosure that 'would constitute' an invasion of privacy that is '*clearly* unwarranted.'" *Id.* (emphasis added).

In *Department of Defense*, the Supreme Court held that an employer-agency's disclosure of its employees' home addresses to the employees' collective bargaining representative would constitute a clearly unwarranted invasion of personal privacy under Exemption 6. 510 U.S. at 489, 114 S.Ct. 1006. In reaching that conclusion, the Supreme Court noted that while *Reporters Committee, supra*, turned on Exemption 7(C), not Exemption 6, the two exemptions overlap to the extent that "the dispositive issue . . . is the *identification* of the relevant public interest to be weighed in the balance, not the *magnitude* of that interest." *Id.* at 496 n. 6, 114 S.Ct. 1006 (emphasis in original).

 As the Court noted in Section I(A)(2), above,

Where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Favish*, 541 U.S. at 174, 124 S.Ct. 1570. There is a presumption of legitimacy accorded to a government official's conduct, *id.* (citing *Ray*, 502 U.S. at 178–79, 112 S.Ct. 541), and the evidence must be sufficient to overcome it.

**B. Analysis**

*1. The Adequacy of the NTSB's Search*

In this motion, Defendants do not move for summary judgment that their search

was adequate, although they did so in the still-pending previous summary judgment motions.

### 2. *Claims of Exemption*

Defendants have moved for summary judgment as to twelve documents not addressed by their earlier motions for partial summary judgment.

#### a. Exemptions Claimed and Not Contested by Plaintiff

Defendants moved for summary judgment that the CIA properly invoked the claimed exemptions to withhold or redact information in the records identified by MORI Document ID numbers 1255551, 1255553 and 1255555. Plaintiff does not contest the use of these exemptions. For this reason, the Court GRANTS summary judgment to Defendants as to these uncontested documents.

#### b. Exemption 4 (Confidential Commercial Information): MORI Document ID# 1305302 and Plaintiff's Record 12

In two documents—one identified by the Government as MORI Document ID# 1305302 and the other by Plaintiff as Record 12 [35]—the CIA has redacted information provided by Boeing for use in the investigation of the crash of Flight 800,

claiming it may be withheld under Exemption 4. Plaintiff challenges these redactions, arguing that their release would not cause Boeing substantial competitive harm.

To assist in the crash investigation, Boeing voluntarily provided information to the CIA and NTSB. *Third Buroker Decl.*, at ¶ 10. This material apparently relates to "flight characteristics and performance of a Boeing 747, for example, lift coefficient, drag coefficient and pitching moment coefficient data." *Id.* Boeing has stated that this information, which concerns the Boeing 747–100, is confidential and proprietary and it has detailed the "substantial competitive harm" disclosure allegedly would cause. *Buroker Decl.*, at ¶ 35. *See generally Breuhaus Decl.* Furthermore, Boeing claims that it would "be forced to reconsider" providing information such as this in the future, if the information is disclosed in this case. *Second Breuhaus Decl.*, at ¶ 14.

Plaintiff does not dispute that, for purposes of FOIA, the information provided by Boeing and withheld by Defendants qualifies as commercial or financial information obtained from a person. Whether it is confidential is the question.

*MORI Document ID# 1305302*[36] consists of two "pages of tabular data from or relating to JFK and ISP radars and nine

---

**35.** Plaintiff's Record 12 can also be identified by MORI Document ID# 1255554. This record also contains other contested redactions under Exemptions 6 and 7(C), which are addressed in the next section of this Order.

**36.** The June 22, 2006 Declaration of John Clarke, Plaintiff's counsel, did not contain arguments in opposition to summary judgment which cited to MORI Document ID# 1305302. However, it did contain opposition to MORI Document ID# 1215200, which Plaintiff split in two and designated as Records 14 and 45. MORI Document ID# 1215200 and 1305302 are, at the least, substantially similar, and the redacted pages

appear to be duplicates of each other. For this reason, in a conference following a hearing in this matter on July 10, 2006, both parties' counsel stipulated that Plaintiff's arguments in opposition to summary judgment for MORI Document ID# 1215200 shall also apply to MORI Document ID# 1305302. Because Plaintiff's Record 14 contains the three pages found in MORI Document ID# 1305302 and redacted under Exemption 4, the Court will consider Plaintiff's arguments found in his response to Record 14 as they relate to the redactions within MORI Document ID# 1305302.

pages of graphs (preliminary), containing handwritten annotations and relating to technical characteristics, e.g., lift coefficient, drag coefficient and pitching coefficient." *Third Buroker Decl.*, at p. 56. Three pages of graphs are redacted in full; the remaining six graphs that were released appear to consist of plotted data points and simulation results.

*Plaintiff's Record 12* is a six-page email dated April 29, 1997. The *Vaughn* index describes it as "addressing points raised by a FBI special agent concerning CIA analysis and conclusions during interagency coordination." The sender and recipient are not identified on the portion that was released. Nor are the initials of various witnesses who are mentioned. From the third page of the released portion of the email, the CIA also redacted slightly more than one line of text. Plaintiff posits that this redaction concerns "wing tip separation under G-load," evidently basing this assumption on the immediately preceding text of the email.

The Court has reviewed the email (MORI Document ID# 1255554 and Plaintiff's Record 12) and the radar graphs (MORI Document ID# 1305302) in their entirety, both having been filed *in camera* and under special seal. Applying the *National Parks* test, the Court finds that Defendants have not proffered evidence sufficient to meet their burden to show that release of this information likely would impair the government's ability to obtain comparable necessary information in the future. Indeed, they do not argue that it would. Simply because Boeing

speculates that it would reconsider its policies of providing information such as this to the government is, by itself, not enough.

The parties disagree whether the disclosure of this information would cause Boeing substantial competitive harm. Defendants maintain that this and other Boeing-provided information is confidential commercial information that has "independent economic value to Boeing because [it is] not freely ascertainable or publicly available for use by other parties." *Breuhaus Decl.*, at ¶¶ 6, 8. The 747 Classic [37] was first developed in the 1960s. *Id.* at ¶ 13. From the point of view of aircraft and computer technology, that distant era was relatively unsophisticated. Now, more than forty years later, aircraft design and manufacture have been modified and refined to a level not only strikingly different, but undoubtedly far superior. This proposition requires no further elaboration. One may therefore reasonably conclude that a one-line reference to this once-confidential information in Plaintiff's Record 12 (MORI Document ID# 1255556) has little or no remaining commercial value insofar as aircraft design is concerned. The same is true of the withheld graphs.

Nevertheless, Defendants maintain, the deleted information retains independent economic value due to its use in flight simulators. Boeing invested several million dollars in compiling this data, and it licenses the data for use in proprietary flight simulators for flight training, engineering and other commercial purposes. *Id.* at ¶¶ 7, 13. [38] Sometimes, these licensees are in direct competition with Boeing.

---

**37.** The 747–100, 747–200, and 747–300 are aerodynamically similar and the series is known as the "747 Classic." *Breuhaus Decl.*, at ¶ 11.

**38.** In their Reply, Defendants contend that Boeing also plans to release a new line of 747 commercial transport aircraft in 2009. *See*

*Third Glass Decl.*, at ¶ 2, Exh. A. However, they fail to show how the release of this information will cause competitive injury to Boeing's sale of these aircraft, to simulator business concerning these aircraft, or otherwise.

*Id.* A flight simulator data package license for the 747 Classic costs approximately $1 million.[39] *Id.* at ¶ 22. Additionally, Boeing claims that no other company has invested the resources to reproduce its training simulator database. *Id.* at ¶ 16. Boeing competes with other companies in providing flight training, aircraft certification and engineering services through its training simulator database, but enjoys a competitive advantage due to its status as the "sole source" of the training simulator data.[40] *Id.* at ¶ 18. A competitor attempting to reproduce this data and sell its own version of the data package would need to make an investment of some $20 million in developmental costs, claims Boeing, and Boeing is aware of no other company that has done so. *Id.* at ¶¶ 15–16.

In response, Plaintiff contends that the data in these records can be independently obtained through the use of computational fluid dynamics ("CFD"). CFD computer programs are used in the aerospace industry to calculate and simulate aircraft performance. *Hoffstadt Aff. (Sept. 8, 2005),* at ¶¶ 4–6.[41] CFD computer programs can be used to model three dimensional models of arbitrary aircraft configurations and can calculate "airflow, pressure, forces, and moments of such shapes...." *Id.* at ¶ 4. One such program, called VSAERO, is sold by Analytical Methods, Inc. ("AMI"),

for $27,500. *Id.* at ¶ 6. AMI also sells the geometry of the 747–200 and the 747–300 for use with VSAERO for $5,000. *Id.* Using VSAERO, in conjunction with this geometry, one can replicate the type of aerodynamic data contained in the withheld records. *Id.* at ¶ 27. Plaintiff's expert, Hoffstadt, states that these records cannot be considered trade secrets because the same information can be obtained from the CFD model with a high degree of precision. *Id.* at ¶¶ 9, 17. Hoffstadt further states that (1) the number of Classic 747s in service continues to drop, lowering the market for these services, and Boeing ceased any new deliveries in 1990; (2) it is unclear to what extent, if any, release of this data would enable a competitor to develop such a package without still having to incur the full amount of Boeing's claimed development costs; and (3) Boeing has not sold any licenses for four years. *Id.* at ¶¶ 29–30, 34, 43.[42] Furthermore, Hoffstadt notes, any competitor would still have to obtain approval and certification from each applicable national aviation regulatory agency, and to do so the competitor would have to present actual flight test data. Boeing has not previously released such data and it would not be required to do so as a result of this motion. *Id.* at ¶¶ 39–40.

**39.** Since 1991, Boeing has sold ten 747 Classic simulator data package licenses to third parties, the most recent having been sold in 2001. *Breuhaus Decl.,* at ¶ 22.

**40.** A wholly owned subsidiary of Boeing operates flight training for the 747 Classic using these simulators. *Breuhaus Decl.,* at ¶ 19. Revenue for these services in 2003 was approximately $7 million. *Id.* at ¶ 20. Boeing also offers engineering services that allow owners and operators of 747 Classic aircraft to secure "Airworthiness Certificates" for modified 747s. No financial information regarding these engineering services was set forth in the NTSB's submissions.

**41.** Hoffstadt is an aerodynamicist who apparently was employed as a technical specialist in the Aerodynamics Group at Boeing from 1997 through 2002. *Hoffstadt Decl. (Oct. 20, 2002),* at ¶ 4.

**42.** Defendants and Boeing reply that CFD programs *cannot* reproduce aircraft aerodynamics data to the level of accuracy required for all of the commercial purposes for which Boeing and third parties use the data. *Breuhaus Decl.,* at ¶ 10.

In *Greenberg v. Food & Drug Administration*, 803 F.2d 1213 (D.C.Cir.1986), an attorney with the Public Citizen Health Research Group requested that the FDA disclose lists of names of customers who had purchased a particular manufacturer's CAT scanners. *Id.* at 1214. The FDA withheld the requested information as "confidential commercial information," save that which had already been disclosed in a newspaper article. *Id.* The district court granted summary judgment to the manufacturer, but the Court of Appeals reversed. The court explained that when "requested information is available at some cost from an additional source, the court must analyze '(1) the *commercial value* of the requested information, and (2) the *cost of acquiring* the information through other means.'" *Id.* at 1218 (quotation omitted). The court concluded that summary judgment was not appropriate because both the cost and availability of the information was contested. *Id.; see also Worthington Compressors, Inc. v. Costle*, 662 F.2d 45 (D.C.Cir.1981) (holding that summary judgment was inappropriate where the issue of the feasibility of reverse engineering was disputed).

For purposes of the pending motion, the Court is required to draw inferences in Lahr's favor. *See Painting Indus. of Hawaii Mkt. Recovery Fund v. United States Dep't of the Air Force*, 751 F.Supp. 1410, 1415 (D.Haw.1990), *rev'd on oth. grounds*, 26 F.3d 1479 (9th Cir.1994) (summary judgment denied when contrary affidavits show factual dispute about whether release of records would harm competitive position of company). The Court therefore assumes that CFD programs, alone, can reproduce the aerodynamics data of the Classic 747s to the level necessary for the simulation software, as stated by Hoffstadt.

 Because Defendants have failed to establish a likelihood that release of this information will cause Boeing substantial competitive harm, the Court DENIES summary judgment as to the graphs withheld from the record constituting MORI Document ID# 1305302, for which Exemption 4 is Defendants' sole basis for withholding this record. As to Plaintiff's Record 12, the Court also DENIES summary judgment to Defendants as to the portion of that email that defendants claim is exempt under Exemption 4.

c. Exemptions 6 and 7(C) (Privacy Redactions): Plaintiff's Records 48 and 12

In two records—Plaintiff's Records 48 and 12, which Defendants identified and referred to as MORI Document ID# 1255552 and 1255554, respectively—the CIA redacted eyewitness identification numbers and the names of eyewitnesses to the crash of Flight 800, claiming both Exemptions 6 and 7(C). Defendants claim that the CIA withheld these names and numbers at the request of the FBI. *Third Buroker Decl.*, at ¶ 9. Preliminarily, both records are emails that qualify as "similar files" under Exemption 6. *Washington Post Co.*, 456 U.S. at 600–02, 102 S.Ct. 1957.

Record 48 is entitled "Response to DIA Concerns on TWA 800 Findings." The document redacts the names of six witnesses whose observations concerning the sight and sound of the crash contradict the CIA's ultimate conclusion of how the crash occurred, but it does contain the CIA's unredacted responses to their observations.

As noted above, Record 12 is a six-page email which addresses "points raised by a FBI Special Agent concerning the CIA analysis and conclusions during interagency coordination." This document was

released in part, with 28 redactions [43] invoking Exemptions 3, 5, 6 and/or 7(C). Plaintiff contests only twelve redactions, one under Exemption 4 (discussed above) and the rest under Exemptions 6 and 7(C).[44] Plaintiff challenges redactions 7–9, 11–18 (including 12A) and 21–22. To the extent that Plaintiff does not challenge the other redactions, such as those claimed to be CIA "assets," I GRANT summary judgment to Defendants.

Preliminarily, the Court finds (because a balancing test is in order) that the crash of Flight 800 and the government's investigation and findings are matters of great public interest.

### i. Privacy Redactions under Exemption 6

 To determine if information should be exempted from disclosure under Exemption 6, a court must balance the privacy interests protected by that exemption against the "the public interest in disclosure." *Fed. Labor Relations Auth.,* 510 U.S. at 495, 114 S.Ct. 1006. The "only relevant 'public interest in disclosure' ... is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contributing significantly to public understanding *of the operations or activities of the government.'"* *Id.* (quoting *Reporters Comm.,* 489 U.S. at 775, 109 S.Ct. 1468) (emphasis in original). The privacy interest, meanwhile, "encompass[es] the individual's control of information concerning his or her person." *Fed. Labor Relations Auth.,* 510 U.S. at 500, 114 S.Ct. 1006 (quoting *Reporters Comm.,*

489 U.S. at 773, 109 S.Ct. 1468) (alteration in original).

Plaintiff argues that no privacy interests are involved in the release of eyewitness identification numbers, and any withholding of eyewitnesses is subject to the balancing test described above.

 Defendants have not established a protectable privacy interest that would be implicated by the release of witness identification numbers. The privacy interest to which they point is that these persons have an "interest in not being subjected to unofficial questioning about the analytic project or investigation at issue and in avoiding annoyance or harassment in their ... private lives." *Buroker Decl.,* at ¶ 46. Defendants do not explain how the disclosure of witness identification numbers, alone, could provide access to these individuals or any personally identifying information about them. Furthermore, the identification numbers are not personal information of a nature ordinarily protected by the courts under Exemption 6, such as social security numbers or personnel records. *See* James T. O'Reilly, 2 *Federal Information Disclosure* § 16:16 (3d ed.2006). For this reason, the Court finds that Defendants have not raised sufficient privacy interests in the identification numbers and DENIES summary judgment on that ground.

 As to these eyewitnesses' names, the burden is on Defendants to show that disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C.A. §§ 552(a)(4)(B), 552(b)(6); *Lion*

---

43. Plaintiff erroneously states there were 27 redactions, but apparently missed one. The Court's analysis encompasses the missed redaction.

44. Plaintiff lists twelve challenged redactions—redactions 6–9, 11–18 and 21–22—but redaction 6 does not concern Exemptions 6 or

7(C). At the same time, however, Plaintiff failed to assign a number to a redaction concerning Exemptions 6 and 7(C)—found between redactions 12 and 13—which the Court will consider challenged and refer to as 12A. Thus, the Court must address twelve challenged redactions after all.

*Raisins*, 354 F.3d at 1079. Defendants have not met their burden of establishing "the significance of the privacy interest at stake." *Ray*, 502 U.S. at 176, 112 S.Ct. 541. The required "particularized explanation," *see Wiener*, 943 F.2d at 977, is absent in both the *Vaughn* index and the accompanying affidavits, although the Third Buroker Declaration does cite to Buroker's previous conclusory assertion that those witnesses have an interest in "not being subjected to unofficial questioning about the ... investigation at issue and in avoiding annoyance or harassment in their official, business, and private duties." *Buroker Decl.*, at ¶ 46 (cited in *Third Buroker Decl.*, at ¶ 9).

The cases under Exemption 6 that have found privacy interests in witnesses' names, separate and apart from other personal information, typically involved witnesses in criminal or quasi-criminal cases; the disclosure of their identities might compromise the case or endanger them. *See, e.g., Balderrama v. United States Dep't of Homeland Sec.*, 2006 WL 889778, at *9, 2006 U.S. Dist. LEXIS 19,421, at *25 (D.D.C. Mar. 30, 2006) (unpublished). In *United States Department of Defense v. Federal Labor Relations Authority*, the Court found a "nontrivial" privacy interest in nondisclosure of home addresses due to wishes of federal employees to avoid unwanted contact at home. 510 U.S. at 500–01, 114 S.Ct. 1006. However, in that case the employees made an affirmative decision not to provide their home addresses to the union. *Id.* Here, the disclosed records would consist of names, not addresses. Defendants proffer no assertions by any of the eyewitnesses, even *in camera*, that they wish to avoid being asked for information. Even assuming these individuals ultimately were contacted, if they were not interested in responding to inquiries, they could easily decline to be inter-

viewed. Therefore, the consequences arising from disclosure appear slight.

On the other hand, disclosure of these persons' identities ultimately could contribute significantly to the "public understanding of the operations or activities of the government." *Fed. Labor Relations Auth.*, 510 U.S. at 495, 114 S.Ct. 1006 (quotation omitted). Plaintiff is trying to contribute significantly to the public's knowledge of what he contends is a massive cover-up by the government of a missile strike on Flight 800. To be sure, Plaintiff already is privy to the government's versions of the accounts these individuals allegedly provided to investigators concerning what they saw, insofar as such information was set forth in the records adjacent to where their names would have appeared had they not been redacted. Disclosure might nevertheless assist Plaintiff in investigating and uncovering government malfeasance by, for instance, leading to individuals who might repudiate what the government attributed to them or might even declare that the government misused or misrepresented the information they provided.

The Court concludes that the balance favors disclosure—the release of the eyewitnesses' names would not constitute a clearly unwarranted invasion of privacy. Therefore, the Court DENIES Defendants' claims concerning the names of eyewitnesses based upon Exemption 6.

*ii. Privacy Redactions under Exemption 7(C)*

■ Defendants also claim that the names of eyewitnesses and the eyewitness identification numbers—the same names and numbers contested under Exemption 6—should be exempted from disclosure based upon Exemption 7(C). To the extent the issue at hand is the *magnitude* of the public interest to be weighed in the

balance, the privacy interest protected by Exemption 7(C) is greater than that protected by Exemption 6, *Reporters Comm.*, 489 U.S. at 756, 109 S.Ct. 1468—assuming Exemption 7(C) is applicable in the first place.

For Exemption 7(C) to apply, the record must be compiled for "law enforcement purposes." Paragraph three of the Third Buroker Declaration states: "As indicated in *note 5* of my June 20, 2005 declaration, CIA's analytical effort was limited in scope. At the request of the FBI, the focus of the CIA inquiry on TWA Flight 800 was to determine what the eyewitnesses saw, not what happened to the aircraft" (emphasis added). Note 5 of the First Buroker Declaration does not illuminate how the CIA's analytic effort was limited in scope and does not explain the relationship between the CIA and FBI during this process. Buroker apparently meant to point to *paragraph 50* of his earlier declaration, which states:

> The information at issue in this case was clearly compiled for law enforcement purposes. The possibility that the explosion of TWA Flight 800 with the loss of all 230 passengers and crew on board may have been the result of a criminal act precipitated what was at that time the most expensive criminal investigation in U.S. history. Of particular concern to FBI investigators were the reports they compiled from dozens of eyewitnesses who reported seeing ... a "flare or firework" ascend and culminate in an explosion. Thus, it was as part of this investigation that the FBI requested the assistance of CIA weapons analysts in determining what these eyewitnesses saw.

*Buroker Decl.*, at ¶ 50. The FBI furnished eyewitness reports to the CIA for this analysis. *Third Buroker Decl.*, at ¶ 5.

 To determine whether a record is compiled for law enforcement purposes, the court applies a two-part test. An "agency may only invoke Exemption 7 if: (1) the records were created as part of an investigation related to the enforcement of federal laws and (2) that investigation was within the agency's law enforcement authority." *Whittle v. Moschella*, 756 F.Supp. 589, 593 (D.D.C.1991) (citing *Pratt v. Webster*, 673 F.2d 408, 420–21 (D.C.Cir.1982)). "The investigation need not result in an arrest or indictment, and the FBI's authority to conduct an investigation can rest on a plausible basis to believe that the law has been violated." *Whittle*, 756 F.Supp. at 593 (citing *King v. United States Dep't of Justice*, 830 F.2d 210, 230–31 (D.C.Cir. 1987)). Here, the CIA may invoke the law enforcement exemption on the FBI's behalf, because it was the FBI that compiled these eyewitness names and statements.

 Like Exemption 6, Exemption 7(C) requires a balancing of "the competing interests in privacy and disclosure." *Favish*, 541 U.S. at 172, 124 S.Ct. 1570. Defendants' asserted privacy interests in individuals' names are the same as those asserted with respect to Exemption 6, above. Exemption 7(C)'s broad privacy rights generally concern criminal or quasi-criminal investigations where those identified may be subject to embarrassment, reputational harm, or worse. *See, e.g., SafeCard Servs. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1205 (D.C.Cir.1991). Although this privacy interest is broader than that of Exemption 6, under these facts, the public interest in uncovering agency malfeasance and wrongdoing outweighs it.

Therefore, to the extent Plaintiff challenges Defendants' redactions, I DENY the motion for summary judgment as to Plaintiff's Records 48 and 12 in full.

d. Exemption 5 (Deliberative Process Privilege): Plaintiff's Records 66, 76, 77 and 78

Defendants move for summary judgment based on Exemption 5 on Plaintiff's Records 66, 76, 77 and 78. All four of these records are NTSB files found in CIA records, and all four, to varying degrees, contain factual material that Defendants maintain is exempt from disclosure because it is organized in a deliberative manner. These "facts" range from organized radar data to graphs of simulations based upon this data. Plaintiff argues that they may not be redacted because facts, without more, do not reveal the deliberative process of an agency.

In the Ninth Circuit,

the scope of the deliberative process privilege should not turn on whether we label the documents "factual" as opposed to "deliberative" ... Factual materials [are] exempt from disclosure to the extent that they reveal the mental processes of decisionmakers ... In other words, whenever the unveiling of factual materials would be tantamount to the 'publication of the evaluation and analysis of multitudinous facts' conducted by the agency, the deliberative process privilege applies.

*Nat'l Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988) (citations omitted). The Ninth Circuit has provided examples of factual materials considered both deliberative and non-deliberative. On one hand, the court in *National Wildlife Federation* held that the United States Forest Service had properly withheld draft Forest Plans and draft Environmental Impact Statements under the deliberative process privilege, because the materials "represent[ed] the mental processes of the agency in considering alternative courses of action prior to settling on a final plan." *Id.* at 1122 (not-

ing that "[m]aterials that allow the public to reconstruct the predecisional judgments of the administrator are no less inimical to [E]xemption 5's goal of encouraging uninhibited decisionmaking than materials explicitly revealing his or her mental processes.").

On the other hand, in *Assembly of the State of California*, the Ninth Circuit held a computer tape containing adjusted census data was neither predecisional nor deliberative and could not be withheld under Exemption 5. *Assembly*, 968 F.2d at 917. The court found that release of this factual material would not enable the public to reconstruct the formulas used by the Census Bureau to generate the adjusted census data. *Id.* at 922. The court also found the deliberative process of the agency had already been revealed. *Id.* at 923.

i. *Plaintiff's Records 66 and 78*

Plaintiff's Record 66 (also NTSB Record 33 and MORI Document ID# 1147380) is a nine-page document presenting "preliminary radar data" that, Defendants state, "provided a starting point for the simulations of the aircraft's flight path." *See Moye Supp. Decl.*, at ¶ 6(a). Defendants claim that "[t]he author(s) culled these data from an enormous collection of radar returns to contribute to the flight path derived from the simulations." *Id.* Defendants argue this information is predecisional and deliberative, and distilling the "significant facts from the insignificant" constituted an exercise of judgment. *Id.*

Plaintiff's Record 78 (also NTSB Record 36) is a sixty-two page document presenting "preliminary radar data" that, Defendants state, also "provided a starting point for the simulations of the aircraft's flight path." *See id.* at ¶ 6(d). Defendants make the same claim that they did as to Record 66 as to its supposed predecisional and deliberative nature. *Id.*

According to Defendants, a "staff member of the NTSB created the information represented on [both Records 66 and 78] to present some preliminary radar data." *Id.* at pp. 62, 115.

As to whether Records 66 and 78 are predecisional, Defendants do not present evidence, but merely imply that they were, in that they were used to compile the final Aircraft Accident Report. *See Second CIA Mot'n,* at pp. 11–12. Plaintiff argues that the records are not predecisional in that they post-date the CIA video animation, which was broadcast on November 17, 1997. Record 66 has several handwritten dates ranging from November 12, 1997 to December 16, 1997 (with two undated pages). The first page of Record 78 contains a handwritten date of November 12, 1997; no other pages are dated. The CIA video animation surely has the status of a final agency decision, but that does not mean it was the *only* final agency decision; the August 23, 2000 NTSB Aircraft Accident Report also is a final agency decision, and to the extent that it does not expressly incorporate the earlier CIA findings, further work on the matter after the November 17, 1997 broadcast would be predecisional. That said, because Defendants have not directly presented evidence that these data sets were used in preparing the final Aircraft Accident Report— conclusorily stating that they were "preliminary" is not enough—summary judgment would not be appropriate.

As to whether Records 66 and 78 are deliberative, Defendants state that the preliminary data "is reflected in the Airline Performance Study and/or the data supporting the Study and the data that matches the publicly available data has been released." *Id.* The headings were released, but handwritten notes and preliminary data have been redacted. *Id.* at pp. 62, 115. Defendants argue that the

"selection of these data culled from hundreds of pages of data give an indication of the preliminary thoughts of how data may be used in the simulation program." *Id.* at pp. 63, 116. In other words, Defendants essentially argue that the release of this data would reveal the deliberative process, because some staff member selected *this* specific data for a reason.

Defendants attempt to explain how disclosure of this data might harm the decision-making process of the NTSB by conclusorily stating that "without the protection provided by the exemption, full and frank discussion of options and opinions so vital to the decision-makers would be impossible." *Id.* at pp. 63, 116 (citing *Crider Decl.,* at ¶¶ 31–32). The Crider Declaration basically contains only tautological support for this proposition, not an explanation or description of the communicative or evaluative procedures the NTSB followed in doing its "culling." Nor does Crider demonstrate why disclosure of what the report did not incorporate would impede other or future deliberations. Simply stating that this data provided a "starting point" for the simulations of the aircraft flight path is not enough. Instead, the agency must show that the deliberative process (or at least part of it) can be determined from the data alone. *Carter,* 307 F.3d at 1091. Thus, for example, information about how data was evaluated, by whom, and how differing views or results were communicated within the investigative team might have established a stronger basis for defendants' claim of exemption.

Defendants have failed to carry their burden that what has been withheld "represent[ed] the mental processes of the agency in considering alternative courses of action prior to settling on a final plan." *Nat'l Wildlife Fed'n,* 861 F.2d at 1122. Defendants' contention would invite agen-

cies to claim that the mere notion that one set of facts was culled from a larger set of facts always and necessarily renders the culled material evidence of the agency's deliberative process.[45]

### ii. Plaintiff's Record 76

Defendants also move for summary judgment on Plaintiff's Record 76. This record (also designated as NTSB Record 34 and MORI ID# 1147382) [46] is a twenty-nine-page document that graphically depicts "various versions of the radar data" provided by the Federal Aviation Agency. *See Moye Supp. Decl.,* at ¶ 6(b). Defendants released twenty-five pages in full, and redacted four. *Id.* Defendants state that the charts "illustrate staff's coordination of various types of data, such as this radar data, used to prepare and/or update evaluations of the accident flight." *Id.* They argue that the data reflects "the personal opinion of the writer [presumably meaning the creator of the graphs] rather than the policy of the agency." *Id.* at p. 74. Plaintiff again argues that this data is factual, does not reflect the personal opinion of the compiler and therefore is not covered by the deliberative process exemption.

These graphs typically consist of grids on which entries have been placed in the form of various symbols. Some contain what literally appear to be lines connecting dots. There is accompanying text that explains the symbols. To a layman, there do not appear to be any differences between the redacted and unredacted pages in either their format or appearance.

■ First, Defendants do not present evidence that the withheld portions of this record or the record in its entirety is predecisional. The date of the document is "unknown," *id.* at p. 74, and it is unclear in what manner, exactly, the document was used. Defendants merely suggest that it helped lead to the final NTSB report and conclusions because it was "used to prepare and/or update evaluations of the accident flight." *Id.* at ¶ 6(b).

Second, Defendants have not shown that this record is deliberative. As with Records 66 and 78, the data contained within these graphs is purely factual. There appears to be no basis for surmising that the withheld portions "expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Assembly,* 968 F.2d at 921 (quotation omitted).

The notion put forth by Defendants that the "graphs of the radar data have been redacted under exemption (b)(5) [because] these data reflect the personal opinion of the writer," *Moye Supp. Decl.,* at p. 74, makes no sense. Simply creating several graphs does not equate to advocating a point of view. It is telling that other graphs that are part of this record and that contain similar radar data were not withheld. If those graphs reflect the writer's "opinion," then such opinion was incorporated into the final agency decision anyway.

Defendants have not met their *Celotex* burden of showing that this material is

---

**45.** To the extent there are handwritten notes found on Records 66 and 78, even Plaintiff does not dispute their presumptive deliberative character. However, because in any event Defendants have not shown that these records are "predecisional," they must still be produced in their entirety.

**46.** Both this record and Plaintiff's Record 77/ NTSB Record 35 share MORI ID# 1147382. The parties, persistently disorganized and indifferent to the impact of sowing confusion, offer no explanation for this overlap.

predecisional or deliberative, and the Court therefore DENIES summary judgment concerning Record 76.

### iii. Plaintiff's Record 77

Next, Defendants move for summary judgment on Plaintiff's Record 77. This record (also designated as NTSB Record 35 and MORI Document ID# 1147382) is a ten-page document prepared by the NTSB staff that depicts in graphic form "various outcomes of the Main Wreckage Simulation for TWA flight 800 depicting differing parameters on the × and y axes." *See Moye Supp. Decl.*, at ¶ 6(c). One graph was released in full; the other nine have been redacted. *Id.* Defendants argue that the data reflects "the personal opinion of the [creator of the graphs, who was a member of the accident investigation team] rather than the policy of the agency." *Id.*

Plaintiff responds, once again, that this data is factual and cannot reflect the personal opinion of the person who compiled it. Plaintiff also argues that the "deliberative process privilege is not available to shield the disclosure of these representations of the simulation because the NTSB claims to have incorporated these conclusions into its report of its final disposition." [47]

■ These graphs are undated and Defendants do not present evidence that this record is predecisional. Although this fails to satisfy Defendants' *Celotex* burden, Plaintiff does not contest summary judgment on this ground. Assuming, therefore, that Record 77 was predecisional, Defendants have nevertheless failed to demonstrate that it is deliberative. Factual materials are exempt from disclosure

only to the extent that they reveal the mental processes of decisionmakers. *Nat'l Wildlife Fed'n*, 861 F.2d at 1119. These graphs of simulation data may (or may not) be the product of the outcomes of various simulations run by the NTSB to determine where wreckage would have been found under various different scenarios, but even if these graphs represent scenarios the NTSB investigated and ultimately rejected, disclosure of the results would not reveal the "mental processes of decisionmakers." The fact of their existence and the apparent absence of any reference to them in a final report does not reveal how or why the NTSB reached its conclusions. Even if one posits that these graphs might be inconsistent with the NTSB's conclusion, the mere disclosure of an inconsistency does not "blow the lid" on the process of decisionmaking. Indeed, in a sophisticated, lengthy and closely-watched investigation such as this, who would be so naive as to assume that there was, or even could be, only one possible conclusion? How could one reasonably expect that there would be no data inconsistent with whatever the conclusion was? Merely confirming contradictions when one would expect them to be present anyway does not say much about an agency's internal deliberations.

The Court DENIES summary judgment concerning this record.

### e. Plaintiff's Record 1

Defendants move for summary judgment that under Exemption 3 certain names and intelligence methods were properly redacted from Plaintiff's Record 1, also designated as MORI Document

---

47. Plaintiff also claims that the one unredacted page shows that the NTSB made false assumptions in its calculations and/or analysis, and he goes on to present a technical basis for that assertion. *Clarke Decl. (June 22,* *2006)*, at p. 29 (Record 77 comments). This argument is irrelevant and lacks merit. It has no bearing on whether such simulations might still expose the agency's decision-making process.

ID# 1255556. Record 1 is a one-page email "reflecting discussion between two CIA employees relating principally to airspeed and one's [sic] analyst's views regarding implications for climb/descent." *Third Buroker Decl.*, at p. 55. Redactions 1 and 7 allegedly consist of names of CIA employees, which the CIA is exempted from disclosing. 50 U.S.C.A. § 403g; *see Minier*, 88 F.3d at 801 (material within the purview of section 403g may be withheld under Exemption 3). Once it is determined that the CIA has statutory authority to withhold the document, the information is categorically exempt. *Id.; Spurlock v. Fed. Bureau of Investigation*, 69 F.3d 1010, 1016 (9th Cir.1995). There is no judicial balancing test in the application of this statute to Exemption 3. *Minier*, 88 F.3d at 801 (citing *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 631, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982) (Congress's scheme is one of categorical exclusion)); *McDonnell v. United States*, 4 F.3d 1227, 1248 (3d Cir.1993) (Exemption 3 does not require factual balancing test).

 The CIA retains broad power to make these determinations. It is the "responsibility" of the CIA, "not of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to unacceptable risk of compromising the Agency's intelligence-gathering process." *Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 180, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). Absent evidence of bad faith in applying the statute, the Agency's determination is "beyond the purview of the courts." *Knight v. Cent. Intelligence Agency*, 872 F.2d 660, 664 (5th Cir.1989).

 Plaintiff argues that the two unidentified persons who exchanged views in this email were high government officials engaged in criminal misconduct. He bases this unfounded contention on two lines from the email: "I say the plane flattened its trajectory because I want it to be at about 8000 feet when it fireballs ..." and "The trick is to come up with a combination of speeds and descent angles that gets you to the right altitude at fireball time." These statements are taken out of context and unfairly distorted. Even those who are cynical have no basis to view such statements as evidence of an unlawful conspiracy. In *Arabian Shield Development Co. v. Central Intelligence Agency*, 1999 WL 118796, 1999 U.S. Dist. LEXIS 2,379 (N.D.Tex. Feb. 26, 1999) (unpublished), Plaintiff contended that "the agency should not be permitted to conceal evidence of crime by classifying documents that are otherwise protected under the National Security Act." *Id.* at 1999 WL 118796, *5, 1999 U.S. Dist. LEXIS, *14. The court rejected that contention and declined to abridge the CIA's broad power to protect documents, stating that the plain meaning of the statute "may not be squared with any limited definition that goes beyond the requirement that the information fall within the Agency's mandate to conduct foreign intelligence." *Id.* (citing *Sims*, 471 U.S. at 169, 105 S.Ct. 1881). I reach the same conclusion here.

 Plaintiff also challenges Defendants' redaction of alleged "sources and methods" of intelligence in Redactions 2, 4, 5 and 6.[48] Although Defendants state that the CIA relied on 50 United States Code Annotated section 403g to withhold intelli-

---

48. In his Opposition papers, Plaintiff did not originally contest Redaction 3, but later did so. Neither Exhibit F to that Opposition nor the later June 22, 2006 Clarke Declaration explain why Redaction 3 was improper, and as such, the Court GRANTS summary judgment as to that redaction.

gence methods, the statute that deals with the withholding of intelligence sources and methods is actually section 403–1(I). Under that statute, the CIA may withhold information that would "disclose 'sources and methods' of intelligence gathering." *Minier*, 88 F.3d at 801 (citations omitted) (concerning disclosure of names of employees). However, the CIA must present evidence, by affidavit or otherwise, that the release of the contested information would actually do so. *See Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 742–43 (9th Cir.1979); *see also Miller v. Casey*, 730 F.2d 773, 777 (D.C.Cir.1984). The First Buroker Declaration presents such evidence only in a general sense, but does not address specific sources and methods of intelligence information. Nor does the Third Buroker Declaration; it only reiterates that "the CIA has withheld an intelligence method" from this document. Having reviewed Record 1 *in camera*, the Court cannot discern just how the extremely limited and few redactions disclose an "intelligence method." However, "the 'sources and methods' statutory mandate [is] a 'near-blanket FOIA exemption,' which is 'only a short step [from] exempting all CIA records from FOIA.'" *Minier*, 88 F.3d at 801 (quoting *Hunt v. Cent. Intelligence Agency*, 981 F.2d 1116, 1120–21 (9th Cir.1992)) (alteration in original). For this reason, the Court finds the CIA's information is sufficient to justify the exemption.

Plaintiff argues Redaction 2 is improper for the additional reason that the information contained in the redaction—supposedly "an infrared satellite"—is incorporated into the agency final decision, in that it was allegedly "recited" in the November 18, 1997 CIA video animation. Plaintiff does not provide support for this assertion. Moreover, by incorporating the content of

a record into an agency final decision, the agency loses only the right to invoke the deliberative process privilege via Exemption 5; the agency may still invoke any other exemption. *Sears, Roebuck & Co.*, 421 U.S. at 161, 95 S.Ct. 1504 ("if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption *other than* Exemption 5") (emphasis added). As such, Plaintiff's argument fails.

The Court GRANTS summary judgment to Defendants on Plaintiff's Record 1.

#### f. The NSA Computer Program

■ Defendants move for summary judgment that, under Exemptions 2 and 3, they properly withheld in full an NSA computer simulation and animations program.[49] Item # 83 of Plaintiff's FOIA request sought a copy of the computer simulation and animation program the CIA and/or the NTSB may have used. It appears that the CIA did use an NSA computer simulation program during its investigation. *See Third Buroker Decl.*, at ¶ 7 ("One record located by the CIA was referred to the [NSA] for its review and direct response to the requester. This 'record' was responsive to [Item # 83].") In refusing to release the computer program, the NSA concluded that it "would reveal investigative techniques" and that it "could expose how the U.S. Government analyzes the performance characteristics of foreign weapons systems that are aerodynamic or ballistic." *Giles Decl.*, at ¶¶ 10–11.

The NSA also concluded that the computer program related to the NSA's core

---

**49.** Defendants have not assigned a document identifier to this program.

functions and activities, and as such was exempted from release under Exemption 3. *Id.* at ¶¶ 12–14.[50] Gathering primary signals intelligence is one of the NSA's core functions. *Id.* at ¶ 4. Its mission "is to intercept communications of foreign governments in order to obtain foreign intelligence information necessary to the national defense, national security, or the conduct of the foreign affairs of the United States." *Id.* The NSA states that "[p]ublic disclosure of either the capability to collect specific communications or the substance of the information itself can easily alert targets to the vulnerability of their communications. Disclosure of even a single communication holds the potential of revealing the intelligence collection techniques," which might then be thwarted. *Id.* at ¶ 6.

Section 6(a) of the National Security Agency Act of 1959 states that nothing "shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency." Accordingly, the NSA need only show that the computer program concerns a specific NSA activity and that its disclosure would reveal information integrally related to that activity. *Hayden,* 608 F.2d at 1390. No showing need be made concerning "the particular security threats posed by the release of the" program. *Linder,* 94 F.3d at 696.

Because of the implications of disclosure of sensitive information by the NSA, courts have recognized the importance of describing only in general terms the content of NSA records and, at times, have allowed the NSA (and other agencies) to file sealed affidavits to further explain the content of withheld materials.

Plaintiff's argument that this record is discoverable, notwithstanding the statutory immunity from disclosure that the NSA enjoys, is based largely on his contention that the NSA failed to disclose (1) the dates the simulation program was used and (2) the inputs into the simulation. These arguments are irrelevant and misplaced. Defendants seek summary judgment that the program itself is exempted from disclosure, not merely that the simulation's inputs are exempt.

Plaintiff also argues that the *Vaughn* index does not include the information Plaintiff requires in order to oppose the claim of exemption. Plaintiff is correct that it is not clear from the Giles Declaration how the computer program used during the investigation of Flight 800's explosion related to the NSA's core mission, insofar as there was no showing (through affidavit or otherwise) that the program involved signal intelligence. The program itself was incomprehensible, consisting in essence of source code.

Given the inadequacy of the government's *Vaughn* index and because a computer program does not easily lend itself to *in camera* review, I ordered Defendants to submit an affidavit, to be reviewed *in camera,* describing how the program concerns a function of the NSA, as well as a general explanation of the purposes for which the program is used, how it works, and how it

---

50. Defendants' Statement of Uncontroverted Facts, paragraph three, cites to paragraph 11 of the Giles Declaration for support that the "NSA uses the [computer] program to 'analyze[] the performance characteristics of foreign weapons systems that are aerodynamic or ballistic.'" This is not exactly what the declaration says—it merely describes how release of the program "could expose how the U.S. Government analyzes" performance characteristics. *Giles Decl.,* at ¶ 11. In any event, Plaintiff does not dispute this statement. *See Pl. S.G.I.,* ¶ 3.

is operated. Defendants submitted such an affidavit, executed by a 38–year employee of the NSA who is a member of that agency's Orbit and Trajectory Modeling Team and is personally familiar with the software. His declaration unequivocally asserts that the software "is a unique tool for foreign weapons system analysis ..." and he provides facts sufficient to support that assertion. The declarant further describes how disclosure of this software, or any part of it, could harm the nation.

Having reviewed this submission *in camera*, the Court concludes that Exemption 3 is applicable and on that basis GRANTS summary judgment to Defendants as to the NSA computer program.[51]

### III. *Conclusion*

For the foregoing reasons, the Court GRANTS summary judgment to Defendants on five of the disputed records at issue in the CIA's Second Motion, and DENIES summary judgment on the remaining seven. (The specific rulings are summarized on page 2 of this Opinion.)

Defendants will not be required to actually provide the required records until the Court rules on the two remaining summary judgment motions, which the Court hopes to do within thirty days. At that point, a single, comprehensive Judgment may be procedurally appropriate and the parties will be in a position to determine whether to appeal.

IT IS SO ORDERED.

---

**51.** Because Exemption 3 is applicable as to the software in its entirety, the Court need not address Plaintiff's contentions as to Exemption 2 or the government's supposed failure to demonstrate that "no segregable, nonexempt portions remain withheld." *Paisley v. Cent. Intelligence Agency,* 712 F.2d 686, 700 (D.C.Cir.1983), *vacated in part on oth. grounds,* 724 F.2d 201 (D.C.Cir.1984); *Allen v. Cent. Intelligence Agency,* 636 F.2d 1287, 1293 (D.C.Cir.1980).